**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**GENARO CASTILLO SUAREZ**

v. 2:25-cv-669-NPM

**COMMISSIONER OF SOCIAL SECURITY**

---

## OPINION AND ORDER

Plaintiff Genaro Castillo Suarez seeks judicial review of a denial of Social Security disability benefits. The Commissioner of the Social Security Administration filed the transcript of the administrative proceedings. (Doc. 11). Suarez filed an opening brief, and the Commissioner responded. (Docs. 14, 19). Suarez has failed to show any reversible error, so the Commissioner's decision is affirmed.

## I. Eligibility for Disability Benefits and the Administration's Decision

### A. Eligibility

The Social Security Act and related regulations define disability as the inability to do any substantial gainful activity by reason of one or more medically determinable physical or mental impairments that can be expected to result in death or that have lasted or can be expected to last for a continuous period of not less than twelve months.[1] Depending on its nature and severity, an impairment limits

[1] *See* 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3); 20 C.F.R. § 416.903(a).

exertional abilities like walking or lifting, nonexertional abilities like seeing or hearing, tolerances for workplace conditions like noise or fumes, or aptitudes necessary to do most jobs such as using judgment or dealing with people.[2] And when functional limitations preclude both a return to past work and doing any other work sufficiently available in the national economy (or an impairment meets or equals the severity criteria for a disabling impairment as defined in the regulatory "Listing of Impairments"), the person is disabled for purposes of the Act.[3]

**B. Factual and procedural history**

On August 21, 2014, Suarez applied for Supplemental Security Income. (Tr. 88, 288–293). He asserted an onset date of December 1, 2013, alleging disability because of depression and "neck problems due to a car accident." (Tr. 78). As of the alleged onset date, Suarez was 62 years old; he had a sixth-grade education and work experience as a truck driver. (Tr. 288, 309, 358, 748). On behalf of the administration, a state agency[4] reviewed Suarez's application and found he was disabled. (Tr. 78–87).

---

[2] *See* 20 C.F.R. §§ 416.913(a)(2)(i)(A)–(D) (discussing the various categories of work-related abilities), 416.922(b) (providing examples of abilities and aptitudes necessary to do most jobs), 416.945(b)–(d) (discussing physical, mental, and other abilities that may be affected by an impairment), 416.994(b)(1)(iv) (defining functional capacity to do basic work activities).

[3] *See* 20 C.F.R. § 416.911(a).

[4] In Florida, a federally funded state agency develops evidence and makes the initial determination whether a claimant is disabled. *See* 42 U.S.C. §§ 421(a), 1383b; 20 C.F.R. § 416.903(a).

The administration subsequently sent Suarez a notice of redetermination because there was reason to believe that fraud was involved in his benefits application.[5] (Tr. 162–171). More specifically, the application was supported by an opinion from psychiatrist Fernando Mendez-Villamil, and Mendez-Villamil had since been charged by a federal grand jury with creating and submitting false evidence for social-security-benefits applicants. (Tr. 163). The administration then reversed its prior award of disability benefits and denied Suarez's request for reconsideration. (Tr. 172–176, 201–203).

At Suarez's request, Administrative Law Judge Raymond Rogers held a hearing during which Suarez was represented by an attorney. (Tr. 53–77). On April 24, 2019, the ALJ found Suarez not disabled since the date of his 2014 application. (Tr. 34–46).[6] The administration's Appeals Council denied Suarez's request for review. (Tr. 1–7). He then sought judicial review, and, at the Commissioner's request, we remanded the case for further administrative proceedings. (Tr. 952–961).[7]

---

[5] The administration is required to redetermine an individual's entitlement to benefits any time there is "reason to believe that fraud or similar fault was involved in the application…." 42 U.S.C. §§ 405(u)(1)(A) and 1383(e)(7)(A)(i). During the redetermination, the administration must "disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." 42 U.S.C. §§ 405(u)(1)(B) and 1383(e)(7)(A)(ii).

[6] In his decision, ALJ Rogers denied Suarez's request to admit the "discredited medical-source statement from Dr. Mendez-Villamil." (Tr. 35).

[7] After ALJ Rogers issued his decision, the administration revised its process for redetermining

ALJ Kathleen Eiler held a hearing on January 28, 2025, with Suarez and his counsel present. (Tr. 758–787). On May 16, 2025, ALJ Eiler issued a decision finding Suarez not disabled from December 1, 2013 (the alleged onset date) through November 13, 2014 (the date of the first ALJ decision). (Tr. 731–757). ALJ Eiler found there was "reason to believe fraud or similar fault was involved in the providing of evidence from Dr. Mendez-Villamil" and that "a legitimate treating relationship [between Suarez and Mendez-Villamil] did not exist."[8] (Tr. 738–739). Therefore, she disregarded evidence from Mendez-Villamil. (Tr. 738). On

---

disability-benefit decisions when there is reason to believe that fraud or similar fault was involved in the original application. *See* Titles II & XVI: Fraud & Similar Fault Redeterminations Under Sections 205(u) & 1631(e)(7) of the Soc. Sec. Act, SSR 22-1p (S.S.A. May 17, 2022); Titles II & XVI: Evaluation of Claims Involving the Issue of Similar Fault in the Providing of Evidence, SSR 22-2p (S.S.A. May 17, 2022).

[8] As ALJ Elier explained,

> Although a finding of "fraud" made as part of a criminal prosecution can serve as a basis for disregarding evidence, such a finding is not required. The adjudicator will find "reason to believe" similar fault exists when there are reasonable grounds to believe that an individual knew that evidence provided was false or incomplete, or that information material to the determination was knowingly concealed. The "reason to believe" standard requires more than a mere suspicion, speculation, or hunch, but it does not require a preponderance of the evidence. Furthermore, adjudicators may make reasonable inferences based on the totality of circumstances, such as facts or case characteristics common to patterns of known or suspected fraudulent activity. It is not necessary that the affected beneficiary or recipient had knowledge of or participated in the fraud or similar fault. Before disregarding evidence based on fraud or similar fault, adjudicators will consider any objections to the disregarding of that evidence (SSR 22-2p). (Tr. 738).

Thereafter, ALJ Eiler provided a thorough analysis to support her finding of fraud, which included consideration of Suarez's objections to disregarding such evidence. (Tr. 738–739). On appeal, Suarez does not contest the ALJ's disregarding evidence from Mendez-Villamil.

July 15, 2025, the ALJ's decision became the final decision of the Commissioner. Suarez then brought the matter to this court, and the case is ripe for judicial review.

**C. The ALJ's decision**

The ALJ must perform a five-step sequential evaluation to determine if a claimant is disabled. 20 C.F.R. § 416.920(a)(1). This five-step process determines:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of his age, education, and work experience, the claimant can perform other work that exists in significant numbers in the national economy.

*Atha v. Comm'r*, 616 F. App'x 931, 933 (11th Cir. 2015);[9] *see also* 20 C.F.R. § 416.920(a)(4).

The governing regulations provide that the Social Security Administration conducts this "administrative review process in an informal, non-adversarial manner." 20 C.F.R. § 416.1400(b). Unlike judicial proceedings, Social Security Administration hearings "are inquisitorial rather than adversarial." *Washington v. Comm'r*, 906 F.3d 1353, 1364 (11th Cir. 2018). "Because Social Security hearings basically are inquisitorial in nature, it is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Id.* Indeed, "at the

[9] Unless otherwise noted, this opinion and order accepts all alterations and omits all citations, footnotes, and internal quotation marks when it quotes judicial decisions.

hearing stage, the commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id.* "Thus, the ALJ has a basic duty to develop a full and fair record." *Id.*

Nonetheless, while the claimant is relieved of the burden of production during step five as to whether there are enough jobs someone like the claimant can perform, the claimant otherwise has the burdens of production and persuasion throughout the process. *See* 20 C.F.R. §§ 416.200 (the claimant must supply evidence to prove eligibility); 416.912 (the claimant must prove disability). In short, the "overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant." *Washington*, 906 F.3d at 1359; *see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (the regulations "place a very heavy burden on the claimant").

At step one of the evaluation, the ALJ found Suarez had not engaged in substantial gainful activity between December 1, 2013, the alleged onset date, and November 13, 2014, the date of the prior award. (Tr. 744). At step two, the ALJ characterized Suarez's severe impairment as "back disorder." *Id.* At step three, the ALJ determined Suarez did not have an impairment or combination of impairments that met or medically equaled the severity of an agency-listed impairment. (Tr. 745).

As a predicate to step four, the ALJ arrived at the following RFC:

> Through November 13, 2014, the date of the prior award, the recipient had the residual functional capacity to perform medium work as defined in

> 20 CFR 416.967(c) except he could occasionally climb, stoop, kneel, or crouch. (Tr. 746).

Relying on a vocational expert's testimony, the ALJ found that Suarez had past relevant work[10] as a truck driver (DOT 904.383-010; generally performed at the medium exertion level but actually performed by Suarez at the light exertion level; semiskilled, SVP 4).[11] Finding no conflict between the RFC and the functional demands of this occupation as reported by the DOT and the vocational expert's testimony, the ALJ found that Suarez remained able to perform his past relevant work, both as generally done by others and as actually done by him. (Tr. 748).

Thus, for purposes of the Act, the ALJ concluded that from December 1, 2013, through November 13, 2014, Suarez was not disabled. (Tr. 748).

## II. Analysis

Suarez's appeal presents four issues for review:

1) whether the ALJ satisfied her duty to develop a full and fair record;

---

[10] Past relevant work is substantial gainful activity done within the past five years and long enough for the claimant to learn its demands. *See* 20 C.F.R. § 416.960(b)(1). Substantial gainful activity is work activity involving significant physical or mental duties usually done for pay or profit, whether or not pay or profit is realized. *See* 20 C.F.R. §§ 416.910, 416.972.

[11] The DOT numbers refer to the *Dictionary of Occupational Titles* and its detailed explanations concerning each occupation's requirements. These descriptions include exertion and skill levels. Exertion refers to the work—in a purely physical sense—that the job requires, and is divided into five categories: sedentary, light, medium, heavy, and very heavy. Skill refers to the time it takes—during or before a job, such as prior experience or education—to develop necessary abilities, and it is divided into three categories: unskilled, semiskilled, and skilled. The "SVP" (Specific Vocational Preparation) provides further subdivision of the three skill categories into nine levels: SVP 1 and 2 are unskilled; SVP 3 and 4 are semiskilled; and SVP 5 through 9 are skilled. The expert's job numbers were for the national economy.

2) whether the ALJ had good cause to discount a treating psychiatrist's medical opinion;

3) whether Suarez presented a colorable claim of mental impairment; and

4) whether the ALJ erred when finding that Suarez could perform past relevant work as actually and generally performed.

**A. Standard of review**

We "may not decide the facts anew, make credibility determinations, or reweigh the evidence." *Buckwalter v. Comm'r*, 997 F.3d 1127, 1132 (11th Cir. 2021). While a court must account for evidence both favorable and unfavorable to a disability finding and view the evidence as a whole, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), our review of the administration's decision is limited to determining whether "it is supported by substantial evidence and based on proper legal standards." *Crawford v. Comm'r*, 363 F.3d 1155, 1158 (11th Cir. 2004).

Substantial evidence is a more-than-a-mere-scintilla standard. "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The inquiry is "case-by-case," and "defers to the presiding ALJ, who has seen the hearing up close." *Id*. at 108. In other words, a "presumption of validity attaches" to the ALJ's factual findings. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). And if supported by substantial evidence, the ALJ's findings of fact are conclusive. *See* 42 U.S.C.

§ 405(g). This means we must affirm, even if we would have reached a contrary result as finder of fact, and even if we find that the evidence "preponderates against" the agency's decision. *Noble v. Comm'r*, 963 F.3d 1317, 1323 (11th Cir. 2020).

**B. The ALJ made a reasonable effort to develop a full and fair record.**

Suarez argues that the ALJ failed to fully and fairly develop the record because she did not obtain 3,360 pages of medical records that *may* be related to Suarez's alleged heart condition. According to Suarez, the unknown content of these records *might* have resulted in a finding that he was disabled. (Doc. 14 at 18–22; Tr. 774). This argument is speculative at best.

The ALJ has a basic duty to develop a full and fair record, which includes making a reasonable effort to obtain medical reports and paying reasonable costs to obtain them. *See* 20 C.F.R. § 416.912(b); *see also Hargrove v. Astrue*, No. 1:11-CV-54-MP-GRJ, 2012 WL 1815600, *10 (N.D. Fla. Mar. 15, 2012). However, the ALJ "is under no duty to go to inordinate lengths to develop a claimant's case," *McCray v. Massanari*, 175 F. Supp. 2d 1329, 1340 n.9 (M.D. Ala. 2001) (quoting *Thompson v. Califano*, 556 F.2d 616, 618 (1st Cir. 1977)), and the duty to develop the record is only triggered when there is ambiguous evidence or when the record is inadequate to allow for a proper evaluation. *Strawder v. Astrue*, No. 1:10–cv–68–MP–GRJ, 2011 WL 5057201, *7, (N.D. Fla. Aug. 8, 2011).

Contrary to Suarez's argument, the ALJ made a reasonable effort to obtain

records related to his alleged myocardial infarction. Indeed, during the hearing, Suarez's counsel informed the ALJ that there were medical records that might reference a myocardial infarction, which may have occurred in 2014 or 2015.[12] (Tr. 766–767). The ALJ allowed counsel additional time to obtain medical records to confirm Suarez's testimony that he had heart problems in 2014 and underwent heart surgery. (Tr. 741, 776–777). When Suarez realized it would cost over $800 to obtain 3,360 pages of medical records from Naples Community Hospital (NCH), he requested assistance. (Tr. 1232). In response, the administration's hearing office used the Health Information Technology Medical Evidence System to request records from January 1, 2013, through December 31, 2016, resulting in fourteen pages of records from NCH. (Tr. 1232–1234, 1236, 1269–1282). The ALJ noted that the hearing office attempted to obtain this additional evidence *twice*. (Tr. 741).

The ALJ further noted that the medical evidence of record did not indicate any treatment for an alleged heart attack. (Tr. 741). Rather, the ALJ observed that medical records dated after the disability period state: "old myocardial infarction January 2015 [Physicians Regional Medical Center]." (Tr. 564, 741). But as the ALJ observed, January 2015 is after the redetermination period. (Tr. 741). Furthermore,

---

[12] During the hearing, Suarez's counsel informed the ALJ that Suarez could not remember which hospital provided treatment for his myocardial infarction. (Tr. 766). Counsel reviewed records from Physicians Regional Medical Center but found no reference to Suarez's heart condition. *Id.* Counsel admitted that he was "not quite sure" when Suarez's alleged myocardial infarction occurred. (Tr. 767).

the ALJ reviewed additional records from PRMC that did not reveal any information about a cardiologist or any treatment related to Suarez's heart. *Id.* Instead, the records only showed that Suarez was taking medication for hypertension, cholesterol, and an anticoagulant. *Id.* Based on the foregoing, the ALJ concluded there was enough evidence to evaluate Suarez's impairments during the relevant time and denied counsel's request to subpoena the records directly from NCH. *Id.*

The ALJ fulfilled her duty by allowing additional time to obtain medical records and, upon Suarez's request, making a reasonable effort to acquire records from NCH. *See Hargrove*, 2012 WL 1815600, at *10 (ALJ need not blindly request thousands of pages of medical records when claimant's counsel is not sure what might be in the records). And since the ALJ concluded she had sufficient evidence to evaluate Suarez's impairments, nothing more was required. *See Strawder*, 2011 WL 5057201, at *7. Ultimately, Suarez bears the burden of proving disability. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). Therefore, Suarez was responsible for producing "complete and detailed" evidence in support of his claim. 20 C.F.R. § 416.912(a)(1).

Moreover, Suarez has not sufficiently demonstrated that he was prejudiced by the absence of the NCH records. *See Mosley v. Comm'r*, 633 F. App'x 739, 742 (11th Cir. 2015) (holding that if an ALJ fails to fulfill her duty to develop the record, remand is only required if "the record reveals evidentiary gaps which result in

unfairness or clear prejudice.”). “Prejudice at least requires a showing that the ALJ did not have all of the relevant evidence before [her] in the record, or that the ALJ did not consider all of the evidence in the record in reaching [her] decision.” *Clark v. Comm’r*, No. 8:20-cv-1261-WFJ-JSS, 2022 WL 428503, *4 (M.D. Fla. Jan. 14, 2022). Suarez speculates that the medical records *could* have made a difference in the outcome of the case because *if* they indicated cardiovascular impairment, the ALJ *may* have found Suarez disabled under the administration’s medical-vocational guidelines. (Doc. 14 at 22). But this suggestion of prejudice is mere conjecture, which is insufficient to warrant remand. *See Kelley v. Heckler*, 761 F.2d 1538, 1540-1541 (11th Cir. 1985).

### C. The ALJ had good cause to discount treating psychiatrist Evelia Iglesias’s medical opinion.

“Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of the claimant’s impairment(s), including the claimant’s symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and the claimant’s physical or mental restrictions.” *Winschel v. Comm’r*, 631 F.3d 1176, 1178-79 (11th Cir. 2011) (quoting 20 C.F.R. § 416.927(a)(2)). And opinions from treating physicians are given substantial or considerable weight unless good cause warrants

otherwise. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).[13]

"Good cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel*, 631 F.3d at 1179. "The ALJ has wide latitude to determine what weight to assign to those opinions, so long as [she] operates within the regulatory and judicial frameworks." *Zanders v. Colvin*, No. CV412-182, 2013 WL 4077456, *5 (S.D. Ga. Aug. 12, 2013). In this respect, ALJs consider several factors, including: (1) the examining relationship; (2) the treatment relationship; (3) whether the opinion is amply supported; (4) whether the opinion is consistent with the record; (5) the doctor's specialization; and (6) other factors that tend to support or contradict the opinion, such as the physician's familiarity with the regulatory framework. 20 C.F.R. § 416.927(c). "[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179. Failure to "clearly articulate the reasons for giving less weight to the opinion of a treating physician" is "reversible error." *Lewis*, 125 F.3d at 1440.

After the redetermination period at issue, Suarez began treatment with psychiatrist Evelia Iglesias. And nearly four years later, on August 10, 2018, Iglesias

[13] Because Suarez filed his application for benefits in 2014, it is subject to the administration's pre-March 2017 regulations about medical opinion evidence.

completed a two-page, check-the-box form entitled “Mental Residual Functional Capacity Assessment.” (Tr. 606–607). Tracking with the methodology used by ALJs to rate the severity of mental impairments, the form asked for an evaluation of the four basic domains of mental functioning: (1) understanding and memory; (2) sustained concentration and persistence; (3) social interaction; and (4) adaptation.[14] But in a departure from the regulatory framework, the form asked for limitations to be assessed using a six-point scale: (1) none; (2) moderate; (3) marked; (4) severe; (5) extreme; or (6) very extreme.[15]

Iglesias did not provide an explanation or cite any objective findings in support of her seemingly restrictive opinion. When asked to provide additional information that would support her assessment, Iglesias referred only to Suarez’s diagnosis of “major depressive disorder, recurrent, severe, with psychosis,” and its chronicity having “induced dementia.” (Tr. 607). In addition, when asked whether Suarez had been disabled from substantial gainful work since December 1, 2013, Iglesias demurred. Instead, she noted that Suarez had a years-long history of “psychiatric disorder with severe depression,” and that the treatment relationship began on May 15, 2015. *Id.*

---

[14] *Cf.* 20 C.F.R. § 416.920a(c)(3).

[15] *But see* 20 C.F.R. § 416.920a(c)(4) and 20 C.F.R. Part 404, Subpart P, Appendix 1, Part 4, Section 12.00(F)(2) (using a different five-point scale).

The ALJ attributed "no weight" to Iglesias's opinion because it was inconsistent with the overall record. (Tr. 748). Recall that the ALJ found reason to believe fraud or similar fault was involved with the evidence offered by Mendez-Villamil. (Tr. 745). Thus, the ALJ excluded such evidence from consideration in this matter. *Id.* Consequently, there were no contemporaneous medical records showing any mental health diagnosis or treatment during the period of redetermination. And if Iglesias's opinion referred to this period (before the treatment relationship began), this absence of any diagnosis or treatment would undermine it. *See Manzo v. Comm'r*, 408 Fed. Appx. 265, 269 (11th Cir. 2011) (lack of treatment provides substantial evidence that alleged mental impairment was not severe); *Ready v. Comm'r*, No. 2:16-cv-573-FtM-MRM, 2017 WL 4277539, *5 (M.D. Fla. Sept. 27, 2017) (same).

Moreover, the ALJ accorded great weight to the contradictory opinion of state agency consulting psychologist Jennifer Cortes,[16] who disregarded any evidence from Mendez-Villamil and found that the remaining evidence did not provide a basis

[16] State agency consultants are considered experts in Social Security disability evaluation, and their opinions are entitled to great weight if supported by evidence in the record. *See* 20 C.F.R. § 416.927(e)(2)(i) (stating that, while the ALJ is not bound by the findings of a State Agency medical consultant, the ALJ should consider such a consultant to be both "highly qualified" and an "expert" in Social Security disability evaluation); *see also Surber v. Comm'r,* No. 3:11-cv-1235-J-MCR, 2013 WL 806325, *5 (M.D. Fla. March 5, 2013) ("State agency medical consultants are non-examining sources who are highly qualified physicians and experts in Social Security disability evaluation, and their opinions may be entitled to great weight if supported by evidence in the record."). On appeal, Suarez does not contest the ALJ's decision to accord great weight to Cortes's opinion.

for any mental-function limitations. (Tr. 105, 596).

Nevertheless, Suarez argues that the ALJ made no attempt to determine whether the mental health evidence from after 2014 supports a finding that he had a mental impairment prior to 2015. In this vein, Suarez places much emphasis on Iglesias's observation that Suarez had a "history of psychiatric disorder with severe depression from years previous to this." (Doc. 14 at 8-9). However, "there is no way of knowing whether the new evidence related to the complaints relative to the time period before the ALJ." *Archer v. Comm'r*, 176 Fed. Appx. 80, 82 (11th Cir. 2006). Indeed, Iglesias merely provided a conclusory statement that Suarez had a history of psychiatric disorder and depression some time before 2018. So the ALJ did not err by failing to reach an "implicit conclusion[] that [Suarez's] medical condition existed for an extended period of time that would cover the period of disability before the ALJ." *Archer*, 176 Fed. Appx. at 83 (citing *Wilson v. Apfel*, 179 F.3d 1276, 1279 n. 4-5 (11th Cir. 1999)).

In sum, a reviewing court will not second-guess an ALJ's decision about the weight given to a medical opinion so long as the ALJ articulates a specific justification for the decision. *See Hunter v. Comm'r*, 808 F.3d 818, 823 (11th Cir. 2015). The ALJ did so here; therefore, we decline—as we must—Suarez's invitation to reweigh the evidence.

**D. Suarez did not present a colorable claim of mental impairment.**

With the exclusion of any evidence from Mendez-Villamil, no weight given to the opinion of Iglesias, and no contemporaneous records of any mental health diagnosis or treatment during the period at issue, the ALJ found at step two that Suarez "did not have any medically determinable mental health impairments." (Tr. 745). Taking issue with this conclusion, Suarez argues that the ALJ gave short shrift to Iglesias's initial diagnosis in 2015 and to an opinion from Suarez's primary care provider, Dr. Arles Perdomo, formulated in 2018.

But Iglesias's 2015 treatment records face the same headwinds that prevented her 2018 opinion from getting off the ground. The records note that Suarez had "chronic" mental impairments, and from this, Suarez contends it is "obvious" that he began to suffer from mental illness before November 2014. (Doc. 14 at 12–13). As we observed above, however, there is no way of knowing as much, and the ALJ was not required to draw any such inference.

Three years later, Dr. Perdomo completed a check-the-box Medical Source Statement dated August 17, 2018. On the one hand, Perdomo checked boxes indicating that Suarez had non-exertional limitations related to chronic pain and a mental impairment. But on the other hand, he left blank the questions that asked for objective evidence and diagnoses in support, as well as the question that asked whether the non-exertional limitations were primarily the result of pain or a mental

impairment. And nowhere in the assessment did Perdomo mention any mental health condition. (Tr. 604–605).

The ALJ gave Perdomo's opinion the same weight given to Iglesias's: none. And for much the same reason. It was inconsistent with the overall record, and it was formulated about four years after the period at issue, with no indication that it was intended to relate back. (Tr. 747). Suarez takes no issue with the ALJ's rejection of Perdomo's opinion. So he is precluded from arguing that the ALJ should have found it to be an acceptable medical source from which a mental impairment could be medically determinable.[17] In sum, Suarez fails to show that a colorable claim of mental impairment was presented to the ALJ. Thus, no step-two error occurred.

**E. Suarez fails to show any reversible error in the ALJ's finding that he could perform his past work as a truck driver.**

As for the final step in the ALJ's analysis, Suarez presents two inconsistent arguments. He argues that his job as a truck driver involved exertion beyond light or medium work, and that the ALJ failed to recognize that his prior work was not that of a truck driver. Naturally, the second argument is undermined by the first. But even if viewed independently, neither has any merit.

As a threshold matter, these points of error were forfeited because Suarez did

[17] A medically determinable impairment cannot be established solely on the claimant's allegations of symptoms; instead, there must be evidence from an "acceptable medical source." 20 C.F.R. § 416.921.

not make any effort to challenge or rebut the vocational expert's testimony on these issues. Based on Suarez's testimony and the overall record, the expert opined that Suarez previously worked as a truck driver, as that job is defined by the Dictionary of Occupational Titles (DOT # 904.383-010), and that while such jobs are generally performed at the medium exertion level, the physical demands of his former job were no more than light. (Tr. 319, 781). Represented by counsel, Suarez neither challenged the expert's qualifications nor questioned this aspect of his opinion. Nor did Suarez offer any opinion testimony in rebuttal. As such, the expert's uncontroverted testimony supplied substantial evidence on this score, and the ALJ was entitled to rely on it. *See Pace v. Comm'r*, 760 F. App'x 779, 782 (11th Cir. 2019) (finding that a reasonable person would accept the expert's testimony in light of the claimant not objecting to it at the hearing); *Bryant v. Comm'r*, 451 F. App'x 838, 839 (11th Cir. 2012) ("The Social Security regulations provide that an ALJ may rely on a VE's knowledge and expertise …."); *Curcio v. Comm'r*, 386 F. App'x 924, 926 (11th Cir. 2010) (same); 20 C.F.R. § 416.960(b)(2).

Moreover, "[s]everal courts have found that a claimant's failure to object or raise an argument before the ALJ relative to [his] past relevant work forecloses the claimant's ability to raise the issue for the first time on appeal." *McDaniel v. Kijakazi*, No. 22-cv-21201, 2023 WL 5510277, *14 (S.D. Fla. Aug. 10, 2023), *report and recommendation adopted*, 2023 WL 5507774 (Aug. 25, 2023). And while

before the ALJ, Suarez did not raise any issue about whether his prior work may be properly classified as that of a truck driver, nor did he suggest that it was anything more than light work. So those arguments are not available to him here. *See Schlegel v. Comm'r*, No. 6:16-cv-1236-Orl-DCI, 2017 WL 2379811, *2–3 (M.D. Fla. June 1, 2017) (claimant's failure to raise a past-relevant-work objection during the administrative proceeding was fatal on appeal); *New v. Comm'r*, No. 5:12-cv-211-Oc-18PRL, 2013 WL 3804846, *3 (M.D. Fla. July 8, 2013) (same).

Even if Suarez could pursue these alleged points of error, he would bear the burden of showing that he could no longer perform his past relevant work, either as he actually performed it or as it is generally performed. *See Waldrop v. Comm'r*, 379 Fed. Appx. 948, 953 (11th Cir. 2010) (citing *Jackson v. Bowen*, 801 F.2d 1291, 1293–94 (11th Cir. 1986)); *see also* 20 C.F.R. § 416.960(b)(2) (explaining the administration considers how the claimant actually performed his past relevant work and how it is generally performed in the national economy). He fails on both counts.

For the actually performed prong, Suarez starts with a nonsensical reading of how he filled out the administration's "Work History Report" (Form SSA-3369-BK). Here's the section at issue:


In **this job**, how many total hours each day did you:

Walk? 8h
Stand? 1h
Sit? 8h
Climb? 2h
Stoop? *(Bend down and forward at waist)* ______
Kneel? *(Bend legs to rest on knees)* ______
Crouch? *(Bend legs & back down & forward)* ______
Crawl? *(Move on hands & knees)* ______
Handle, grab or grasp big objects? ______
Reach? ______
Write, type or handle small objects? ______

While this would suggest that Suarez worked 19-hour days, he reported—on the same page—working 8 hours per day, 5 days per week. (Tr. 319).[18] Obviously, one cannot work 19 hours during an 8-hour workday. Nevertheless, Suarez suggests the ALJ should have set common sense aside and found that Suarez had to "perform 8 hours of walking and 8 hours of sitting in an 8-hour workday." Doc. 14 at 16. This is patently absurd and certainly does not suggest reversible error.

Worse yet, Suarez turns the regulatory exertion-level classifications on their head. He contends that medium work, as provided in his RFC, involves no more than six hours of sitting or walking, and from there, he argues that since his previous work as a truck driver involved sitting for eight hours each day and walking for eight hours each day, he was no longer able to do it as he actually performed it.

But medium work is defined as involving "frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c). "Frequent," in turn, is defined as an activity that occurs "off and on, for a total of approximately 6 hours in an 8-hour workday." Titles II & XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251, *6 (S.S.A. 1983). Thus, to be eligible for the full range of medium-level work, one must be capable of carrying 25-pound objects (and thereby walking) for at least six hours

[18] As part of his application, he also reported transporting agricultural goods as a truck driver 5 hours a day, 3 days a week. (Tr. 309).

in an eight-hour workday.

In other words, the duty to carry up to 25 pounds for six hours translates to a minimum, not a maximum walking capability.[19] Indeed, the Dictionary of Occupational Titles (DOT) and its companion, Selected Characteristics of Occupations (SCO), further define the full range of medium work as involving the ability to *constantly* carry up to ten pounds. *See* Dictionary of Occupational Titles, Appendix C - Components of the Definition Trailer, 1991 WL 688702 (G.P.O. 1991); Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix C. Physical Demands (1993), www.obflegal.com/httpdocs/files/SCO.pdf.[20] And without other restrictions, one who is capable of medium work is capable of sedentary work, that is, sitting for most of the workday. *See* 20 C.F.R. § 416.967. Thus, this alleged point error is frivolous.[21]

As for the generally performed prong, Suarez makes no attempt to show a

[19] Even light work includes occupations that involve "a good deal" more than six hours of walking, when little to no lifting or carrying is involved. 20 C.F.R. § 416.967(b).

[20] *See also* 20 C.F.R. § 416.966(d)(1) (the administration takes administrative notice of job data in the DOT); SSR 24-3p, Titles II and XVI: Use of Occupational Information and Vocational Specialist and Vocational Expert Evidence in Disability Determinations and Decisions, 89 Fed. Reg. 97158, 97159 (Dec. 6, 2024) ("We continue to recognize the DOT as a valid and reliable source of occupational information, and we will continue to use it in adjudication.").

[21] Counsel of record for Suarez are well acquainted with the regulatory standards and vernacular. We admonish them to be mindful of their Rule 11 obligations and the court's authority to impose sanctions on its own initiative. Reliable and persuasive authorities have assessed the current value of the court's time at about $2,100 per hour, and preposterous or spurious arguments wrongfully divert our limited resources from resolving legitimate disputes. Too often, alleged points of error advanced by this law firm—in this case and others—are best left on the cutting-room floor.

conflict with his RFC. Instead, he argues that his prior work was a composite job that precluded any analysis of how others may have performed it. (Doc. 14 at 17). A composite job is one that has "significant elements of two or more occupations and, as such, [has] no counterpart in the DOT." *Smith v. Comm'r*, 743 F. App'x 951, 954 (11th Cir. 2018) (quoting SSR 82-61, 1982 SSR WL 31387, *2). Past relevant work may qualify as a composite job "if it takes multiple DOT occupations to locate the main duties of the [past relevant work] as described by the claimant." Program Operations Manual System ("POMS") DI 25005.020. And since a composite job is unique to the individual, an assessment of the duties of such a job, as performed by others, is not possible. *Id*.

Suarez testified that during his work as a truck driver, he either drove the truck or sat next to the driver; he could not apportion his time between the two. (Tr. 771–773). From this, Suarez contends that he performed substantial duties of another—unidentified—occupation. *Id.* at 18. But with no attempt to suggest any other DOT occupation that might be implicated, he cannot sustain his burden of persuasion. *See Smith*, 743 F. App'x at 954. Besides, Suarez repeatedly described his job as nothing more than a truck driver. (Tr. 309, 325, 358). And he expressly disclaimed other duties, stating his work neither involved any lifting, nor the use of any machines or technical skills, the supervision of others, or the generation of any reports. (Tr. 319). At bottom, his admissions of record—and the uncontested testimony of the

vocational expert—supplied substantial evidence for the ALJ's approach, and that is all that is needed.

## III. Conclusion

Substantial evidence supports the ALJ's decision, and there was either no error or no harmful error in the ALJ's application of the correct legal standard. Accordingly, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g), and the clerk is directed to enter judgment in the Commissioner's favor, terminate all scheduled events, and close the case.

**ORDERED** on September 28, 2026

NICHOLAS P. MIZELL
United States Magistrate Judge